

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

THOMAS HOOTSELLE, JR., et al., )
individually and on behalf of all others )
similarly situated, and MISSOURI )
CORRECTIONS OFFICERS )
ASSOCIATION, )
  )
  ) **WD82229**
  Respondents, )
v. ) **OPINION FILED:**
  ) **October 8, 2019**
  )
MISSOURI DEPARTMENT OF )
CORRECTIONS, )
  )
  Appellants. )

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Patricia S. Joyce, Judge**

**Before Division Two:** Lisa White Hardwick, Presiding Judge, and
Thomas H. Newton and Mark D. Pfeiffer, Judges

The Missouri Department of Corrections ("DOC") appeals the judgment of the Circuit Court of Cole County, Missouri, granting partial summary judgment to class plaintiffs corrections officers and their collective bargaining representative, Missouri Corrections Officers Association ("MCOA") (jointly referred to herein as "officers") on their breach of contract claim as to the issue of the compensability of the officers' pre- and post-shift required tasks; the amended judgment awarding past damages in favor of the officers in accordance with the jury

verdict; and granting declaratory judgment ordering DOC to compensate the officers for the pre- and post-shift tasks at issue prospectively. We affirm.

## Factual and Procedural Background

DOC executed a labor agreement ("CBA") with MCOA in 2007 and again in 2014. In addition, DOC promulgated a Procedure Manual ("Manual"). These collective documents govern various rights and duties of the officers and DOC ("contract").[1] The CBA and Manual are both consistent in the stated purpose of ensuring compliance with the Fair Labor Standards Act[2] ("FLSA"). The CBA states that the DOC "will comply with the FLSA," and the Manual states that it is intended "to ensure departmental compliance with FLSA rules[.]"

In 2012, the officers brought a class action against DOC alleging, among other things, breach of contract for failure to pay for pre- and post-shift activities performed, and for declaratory judgment regarding their right to compensation for these activities in the future under the contract. The circuit court certified a class of more than 13,000 current and former corrections officers in February of 2015, and subsequently amended the class definition in September of 2015.[3]

The daily pre- and post-shift activities which in the aggregate added an additional thirty minutes to the officers' daily work routine, and for which they alleged they were not being compensated include:

1) Electronically logging their arrival or departure from the facility by either scanning a Bar Coded or Radio Frequency Identification (RFID), and/or manually signing in or initialing a paper entry/exit record, and/or submitting

---

[1] "DOC does not dispute that the definitions and terminology in its Department Manual are incorporated into the Labor Agreement." *Mo. Corr. Officers Ass'n v. Mo. Dep't of Corr.*, 409 S.W.3d 499, 500 (Mo. App. W.D. 2013).

[2] *See* 29 U.S.C. § 201 *et seq.*, as amended by the Portal-to-Portal Act of 1947, § 251 *et seq.*

[3] The class is defined in the Amended Judgment as: "All Persons Employed In Positions As Corrections Officer I Or Corrections Officer II By The Department Of Corrections Of The State Of Missouri At Any Time From August 14, 2007 To The Present Date for Claims Relating to Unpaid Straight-Time Compensation and From August 14, 2010 To The Present Date for Unpaid Overtime Compensation."

to biometric identification such as a finger print or palm scanning instrument, or a combination of these things;

2) Utility officers may be required to report to the Central Observation Post to receive assignments;

3) Passing through security gates/entry-egress points, including passing through a metal detector on arrival and through an airlock when entering and exiting the security envelope;

4) Presenting themselves before a custody supervisor who communicated to the officers their daily post/duty assignment;

5) Picking up or returning equipment such as keys or radios from electronic key boxes or key/radio issue rooms;

6) Walking to and from the entry/egress points to duty post and possibly waiting in line if one has formed for any of the above activities;

7) In the case of vehicle patrol officers, inventorying the vehicle patrol's issued weapons, ammunition, and equipment prior to and at the end of each shift; and

8) Passing of pertinent information from one shift to another.

The circuit court granted the officers' motion for partial summary judgment on their breach of contract claim in August of 2018, finding there was no genuine dispute of material fact regarding the existence and terms of the contract, that the officers had performed pursuant to the contract, that DOC had breached the contract, and that the officers had been damaged by DOC's failure to compensate the officers as required pursuant to the contract. The suit then proceeded to a jury trial solely to determine the officers' damages, and the jury returned a verdict against DOC for past damages of $113,714,632. The court entered an amended judgment reflecting the jury's past damages award, as well as granting declaratory judgment for the officers as to the parties' contractual rights and obligations pursuant to the contract moving forward.

DOC timely appeals.

**Analysis**

DOC's first three points on appeal assert the granting of summary judgment[4] in favor of class plaintiffs and denying summary judgment for DOC on plaintiffs' breach of contract claim were erroneous because (Points I and II) the class members' pre- and post-shift activities are "preliminary" and "postliminary" activities, the time spent on them is *de minimis*, and they are therefore not compensable under FLSA or under state laws or contracts that incorporate FLSA standards; and (Point III) private plaintiffs may not pursue a statutory or regulatory claim against the state under the guise of a breach of contract claim.

FLSA was enacted in 1938 and provided for a minimum wage and overtime compensation for hours worked in excess of forty hours per workweek. *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 135 S. Ct. 513, 516, 190 L. Ed. 2d 410 (2014) (citing §§ 6(a)(1), 7(a)(3), 52 Stat. 1062-1063). An employer found to have violated these provisions could be held civilly liable for backpay, liquidated damages, and attorney's fees. *Id.* (citing § 16, 52 Stat. 1069). As a result of FLSA's failure to define "work" or "workweek," and the U.S. Supreme Court's broad interpretation of those terms in subsequent decisions through early 1946, courts across the country saw a "flood of litigation" in the latter part of 1946 seeking "nearly $6 billion in back pay and liquidated damages for various preshift and postshift activities." *Id.* Congress reacted by passing the Portal-to-Portal Act, which exempted employers from liability for future claims based on:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

---

[4] Our review of a circuit court's grant of summary judgment is essentially *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We are not concerned with the route taken by the circuit court in arriving at its judgment; rather, we are only concerned that the legal conclusion is correct. *Seaton v. City of Lexington*, 97 S.W.3d 72, 75 n.2 (Mo. App. W.D. 2002) ("The granting of summary judgment will not be set aside on review if supportable on any theory because the primary concern of the appellate court is the correctness of the result in the trial court, not the route taken to reach it.").

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

*Id.*; 29 U.S.C. § 254(a). That said, the Supreme Court "has consistently interpreted the term principal activity or activities [to] embrac[e] all activities which are an integral and indispensable part of the principal activities." *Id.* (internal quotation marks omitted).

The regulations interpreting the Portal-to-Portal Act establish that "[w]here . . . an employee is required by his employer to report at a particular hour at [the] place where he performs his principal activity, if the employee is there at that hour ready and willing to work but for some reason beyond his control there is no work for him to perform until some time has elapsed, waiting for work would be an integral part of the employee's principal activities." 29 C.F.R. § 790.7(h). The regulation describes this compensable activity as being "engaged to wait." *Id.*

Here, viewing the facts in the light most favorable to DOC, *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993), it is undisputed that the officers are "on duty and expected to respond" if incidents of "offenders confronting staff and becoming physical" occur at any time after they go into the facility. When they are on the premises, officers are "expected to act as a prison guard" during their pre-shift and post-shift required activities. Officers must "pay attention to the offenders absolutely at all times[.]" Inside the premises, it is imperative that the officers are "going to be mindful of [offenders'] behavior." Officers "have to monitor and pay attention to offenders walking to their post and walking back[.]" Officers are trained to be careful during pre- and post-shift activity and shift

5

change time because they know those are the times that prisoners often take action, such as escape attempts and staging fights to divert officers' attention.[5]

Given DOC's undisputed knowledge of, and expectation for, the officers' requirement to utilize their training to guard against prisoner fights and escape attempts during shift changes, we conclude that the preliminary and postliminary activities of the officers are not "pre" or "post" at all; instead, these shift change activities are "integral and indispensable" to the officers' "principal activities" for which they are hired by DOC, that is, guarding against and protecting the public from prison riots and escape attempts. According to Supreme Court precedent, these activities are, indeed, part of the officers' "principal activities" of employment by DOC and must be compensated pursuant to FLSA. *Integrity Staffing Sols., Inc.*, 135 S. Ct. at 519.

Further, at minimum, the officers are "required by [their] employer to report at a particular hour at [the] place where [they] perform[] [their] principal activity," and the officers are "there at that hour ready and willing to work." 29 C.F.R. § 790.7(h). The officers are "on duty and expected to respond[,]" "act[ing] as a prison guard[,]" whether or not offenders take action requiring officers' intervention. In other words, the officers are "waiting for work[,]" at *all* times from the moment they arrive at the premises, which is, as such, "integral and indispensable to [their] principal activities." *Integrity Staffing Sols., Inc.*, 135 S. Ct. at 519.

Likewise, DOC's argument that the pre- and post-shift activities of the officers are not compensable because they are *de minimis* is without merit. The *de minimis* doctrine is described in 29 C.F.R. § 785.47:

---

[5] These undisputed facts derive from DOC's deposition admissions by its representatives and responses to the officers' Statement of Undisputed Material Facts in Support of Summary Judgment. In fact, on occasions when a fight or escape attempt occurs during these shift changes, DOC admits that it compensates the officers for this time because they are actively engaged in "guarding" the public from the dangerous criminals—instead of making ingress or egress to their "guard" posts. This admission contradicts DOC's argument that the pre- and post-shift activities are not otherwise "integral and indispensable to their principal activities."

In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (citations omitted). "Courts consider the following factors when determining whether the work performed by the employee is *de minimis*: "[1] the amount of time spent on the extra work, [2] the practical administrative difficulties of recording additional time, [3] the regularity with which the additional work is performed, and [4] the ***aggregate*** amount of compensable time." *Lyons v. ConAgra Foods Packaged Foods LLC*, 899 F.3d 567, 584 (8th Cir. 2018) (emphasis added) (internal quotation marks omitted). "Although the amount of daily time spent on the additional work is [a]n important factor in determining whether a claim is *de minimis*, no precisely calculated, rigid durational period applies, but [m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable." *Id.* (internal quotation marks omitted).

Here, the most dangerous, relevant, and integral part of the officers' "extra work" is the transition from entering the correctional facility and arriving at their shift post—where the threat of prison riots and attempted escapes are real, formidable, and of such nature as to require diligent attention and readiness to intervene. This "extra work" is *daily*. It is *not* a ten minute or less daily activity; instead, combined with the entire pre/post shift "extra work" ***in the aggregate***, the officers are spending thirty minutes per day on this "extra work." Hence, both substantively and quantitatively, the "extra work" demanded of the officers simply cannot be categorized as *de minimis*.

Not only does DOC's argument ignore the *Lyons* factors, which we conclude support the circuit court's summary judgment ruling, DOC instead cites to inapposite precedent in which DOC isolates and takes out of context the entirety of the expectations it has for its officers in arriving at and exiting their shift post and the ***aggregate*** time necessary to complete such expected and integral tasks.[6]

Points I and II are denied.

DOC next argues that the officers may not bring an FLSA claim "under the guise of" a breach of contract claim. While it is true that FLSA does not create a private right of action for its enforcement, the officers were granted partial summary judgment on a breach of contract

---

[6] DOC isolates each activity:

1) Checking into and out of the facility, citing as support *Aguilar v. Mgmt. & Training Corp.*, Civil No. 16-00050 WJ/GJF, 2017 WL 4804361 (D.N.M. Oct. 24, 2017) (appeal pending); *Mertz v. Wis. Dep't of Workforce Dev.*, No. 2014AP2602, 2015 WL 6181046, at *1, *4-5 (Wis. App. Oct. 22, 2015) (per curiam);

2) Receiving work assignments, citing as support *Carter v. Panama Canal Co.*, 314 F. Supp. 386, 392 (D.D.C. 1970); *Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 806 (D. Md. 2014); *Colella v. City of New York*, 986 F. Supp. 2d 320, 343 (S.D.N.Y. 2013); *Aguilar*, 2017 WL 4804361, at *1, *7-8;

3) Passing through security, citing as support *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 518 (2014); *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-94 (2d Cir. 2007); *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1341 (11th Cir. 2007); *Aguilar*, 2017 WL 4804361, at *6;

4) Retrieving radios and keys, citing as support *Gorman*, 488 F.3d at 594; *Aguilar*, 2017 WL 4804361, at *1-2, *9-12; *Albrecht v. Wackenhut Corp.*, 379 F. App'x 65, 67 (2d Cir. 2010); *Colella*, 986 F. Supp. 2d at 339;

5) Walking to one's post and waiting in line, citing as support *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 691-93 (1946); *Carter*, 314 F. Supp. at 391-92; *Aguilar*, 2017 WL 4804361, at *14-15; *Bonilla*, 487 F.3d at 1341, 1342-43; *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40 (2005);

6) Passing information between shifts, citing as support *Colella*, 986 F. Supp. 2d at 343; *Aguilar*, 2017 WL 4804361, at *1, *7-8; *Butler*, 55 F. Supp. 3d at 806-08; and

7) Inventorying vehicle equipment, citing as support *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 420 n.55 (5th Cir. 2011); *Butler*, 55 F. Supp. 3d at 810-11; *Colella*, 986 F. Supp. 2d at 342-43.

DOC, however, fails to ***aggregate*** the activities and time spent thereon and fails to cite to any precedent in which similar ***aggregate*** activities are at issue. Instead, DOC argues that each ***isolated*** activity, even if such activity were compensable, "would be properly disregarded as *de minimis*," citing *Carter*, 314 F. Supp. at 392 (holding that walking time of two to fifteen minutes, with an average of eight minutes, was *de minimis* and citing cases holding that five minutes, ten to eleven minutes, and ten minutes were all *de minimis*); *Albrecht*, 379 F. App'x at 67; *Aguilar*, 2017 WL 4804361, at *16-19. Again, DOC fails to cite to any precedent, where like here, the aggregate pre- and post-shift activities are *thirty* minutes daily—and, in fact, fails to cite any precedent where such activities in excess of *fifteen* minutes were deemed *de minimis*.

8

claim, not an attempted private action for violation of FLSA. DOC does not dispute that it entered into the subject CBA, and collective bargaining agreements are contracts, "subject to the same rules of interpretation as other contracts." *Allen v. Globe-Democrat Publ'g Co.*, 368 S.W.2d 460, 463 (Mo. 1963). Here, the contract, comprised of the CBA and the Manual, while it does, in part, provide that DOC will comply with FLSA, also sets forth numerous pages of additional rights and obligations of the officers and of DOC. DOC may not avoid its obligations under the contract it executed with the officers by pointing to provisions that it consented to, which include reiterating its obligation to comply with FLSA.

The officers brought their claim for breach of contract pursuant to expressly denominated terms of *the contract* and not as a private litigant pursuant to *FLSA*. "It is well established . . . that the FLSA does not have the requisite preemptive force to convert a plaintiff's State claims to a claim under the FLSA." *Bowler v. AlliedBarton Sec. Servs., LLC*, 123 F. Supp. 3d 1152, 1156-57 (E.D. Mo. 2015) (collecting Eighth Circuit cases finding no preemption of state common law claims and that FLSA does not provide the exclusive remedy for its violations).

The officers' present breach of contract claim depends on the contract's provisions as to "hours worked" and "physically worked" and provisions regarding DOC's compliance with FLSA. Whether or not those contractual terms are interpreted by reference to FLSA, the officers' claim is a breach-of-contract claim under state law, and it is not preempted by FLSA.

Point III is denied.

In its fourth point on appeal, DOC argues that the circuit court committed reversible error in the exclusion of DOC's rebuttal[7] expert witness testimony.[8]

---

[7] The admissibility and scope of rebuttal evidence is within the discretion of the trial court, and, "absent an abuse of that discretion, we will not reverse the trial court's decision." *Aliff v. Cody*, 26 S.W.3d 309, 315 (Mo. App. W.D. 2000) (internal quotation marks omitted). "An abuse of discretion occurs when the court's ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling

9

Though DOC's argument on appeal as to the admissibility of its rebuttal expert, Dr. Chester Hanvey, focuses on the admissibility of such expert testimony as outlined by Missouri's expert witness statute, § 490.065.2, DOC conveniently ignores the circuit court's authority to administer the rules of discovery and its broad discretion to strike experts and their corresponding opinions not timely disclosed—which is the authority that we conclude was properly exercised by the circuit court below.

"'A trial court is vested with broad discretion in administering the rules of discovery, and an appellate court should not disturb the rulings absent an abuse of discretion.'" *Jones v. City of Kansas City*, 569 S.W.3d 42, 61 (Mo. App. W.D. 2019) (quoting *State ex rel. Plank v. Koehr*, 831 S.W.2d 926, 927 (Mo. banc 1992)). "'This discretion should be aimed toward achieving fundamental fairness and avoiding unfair disadvantage.'" *Id.* (quoting *Scheck Indus. Corp. v. Tarlton Corp.*, 435 S.W.3d 705, 719 (Mo. App. E.D. 2014)). "'Missouri caselaw has consistently held that courts have broad discretion to strike expert witnesses who are not timely filed,'" *Scheck Indus. Corp.*, 435 S.W.3d at 718 (quoting *Legg v. Certain Underwriters at Lloyd's of London*, 18 S.W.3d 379, 386 (Mo. App. W.D. 1999)), or for whom "new or different facts not previously disclosed" and relied upon are untimely disclosed, *Beaty v. St. Luke's Hosp. of Kansas City*, 298 S.W.3d 554, 560 (Mo. App. W.D. 2009). "[U]ntimely disclosure of an expert witness'[s] identity [and opinions about which he or she is expected to testify] is so offensive to the underlying purposes of the discovery rules that prejudice may be inferred."

shocks the sense of justice and indicates a lack of careful deliberate consideration." *Mansil v. Midwest Emergency Med. Servs., P.C.*, 554 S.W.3d 471, 475 (Mo. App. W.D. 2018) (internal quotation marks omitted).

[8] DOC's claim of error as to the exclusion of Dr. Elizabeth Arnold's testimony is not preserved for appellate review, as DOC made no offer of proof as to what her testimony would have been at the damages trial. *Terry v. Mossie*, 59 S.W.3d 611, 612 (Mo. App. W.D. 2001) ("'Normally, an appellate court will not review evidence excluded by the [circuit] court unless a *specific* and *definite* offer of proof was made at trial . . . show[ing] . . . : (1) what the evidence will be; (2) the purpose and object of the evidence; and (3) *each fact essential* to establishing the admissibility of the evidence.'").

*Alberswerth v. Alberswerth*, 184 S.W.3d 81, 101 (Mo. App. W.D. 2006) (internal quotation marks omitted).

Here, approximately six years after the present lawsuit had been pending, seven months after the officers had disclosed their expert witness on damages and made such expert available for deposition, a month after the circuit court had closed discovery (with an order stating "no further discovery") after extensive pre-trial discovery and numerous DOC motions for trial continuance (all of which were granted), and weeks before trial was scheduled to commence, DOC produced a twenty-page affidavit and over 1000 pages of supporting documentation from its rebuttal expert witness, Dr. Hanvey.

At a hearing in which one of the issues[9] related to a motion to strike expert witness testimony was the issue of DOC's late expert witness disclosure, the circuit court noted its frustration with DOC's late disclosure, expressed disbelief that DOC would not have thought it important to have their expert witness "on line and ready to go" years earlier, and noted disdain for DOC's admission that the 1000 pages of expert witness supporting documentation should have been produced months earlier and prior to the close of discovery. The circuit court subsequently issued its ruling striking DOC's proffered expert witness testimony.

On this record, we refuse to conclude that the circuit court's ruling was an abuse of discretion.[10]

Point IV is denied.

---

[9] As to the exclusion of evidence, "'it is well settled that if the action of the trial court was proper on any ground, although not asserted, such action will be upheld.'" *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014) (quoting *Franklin v. Friedrich*, 470 S.W.2d 474, 476 (Mo. 1971)).

[10] In addition, even were we to agree with DOC that the circuit court had abused its discretion, which we do not, DOC has failed to demonstrate that the circuit court's ruling "caused outcome-determinative prejudice materially affecting the merits of the action." *Mansil*, 554 S.W.3d at 475. Much of Dr. Hanvey's proffered testimony was irrelevant to the issue of the amount of damages that had been sustained by the officers and the remainder of Hanvey's testimony was elicited through other witnesses at trial and, hence, was cumulative of other evidence introduced at trial. *Saint Louis Univ. v. Geary*, 321 S.W.3d 282, 292 (Mo. banc 2009) ("A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence.").

In DOC's fifth point on appeal, it claims that refusing to decertify the class of plaintiffs was an abuse of discretion because individual questions predominated and a class action was not superior to other available methods of adjudication.

The decision of the circuit court as to whether to decertify a class is reviewed for abuse of discretion. *Ogg v. Mediacom, LLC*, 382 S.W.3d 108, 113 (Mo. App. W.D. 2012). "An abuse of discretion occurs if the circuit court's decision is clearly against the logic of the circumstance, is arbitrary and unreasonable, and indicates a lack of careful consideration." *State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 599 (Mo. banc 2012) (internal quotation marks omitted). A court has abused its discretion in refusing to decertify a class only where that decision "is based on an erroneous application of the law or the evidence provides no rational basis for certifying the class." *Id.*

Class certification decisions are procedural matters governed by Rule 52.08. *Elsea v. U.S. Eng'g Co.*, 463 S.W.3d 409, 417 (Mo. App. W.D. 2015). DOC challenges only the requirements of Rule 52.08(b)(3) "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

*Predominance*

Predominance requires a proposed class to be "sufficiently cohesive to warrant adjudication by representation" and does *not* require every single issue to be common to all class members, but rather that there be "one single common issue that is the overriding issue in the litigation." *Smith v. Am. Family Mut. Ins. Co.*, 289 S.W.3d 675, 688 (Mo. App. W.D. 2009) (internal quotation marks omitted). In fact, "[t]his single predominant issue need not even be

12

dispositive of the case." *Id.* "[T]he fundamental question is whether the group aspiring to class status is seeking to remedy a common legal grievance." *Id.* (internal quotation marks omitted).

In its order denying DOC's motion for class decertification, the circuit court expressly found the predominance requirement to be met:

> the record reflects that the common issues predominate in this litigation, including whether a contract exists between Plaintiffs and Defendants; whether the contract requires Defendants to comply with the FLSA's overtime requirements; whether the pre- and post-shift activities performed by Plaintiffs are compensable under the FLSA and the contract; whether Defendant['s] system-wide common policies and procedures are violations of the FLSA; whether Defendant['s] refusal to compensate Plaintiffs for pre- and post-shift activities is a breach of its contract with Plaintiffs; whether Defendant DOC has been unjustly enriched at the expense of Plaintiffs and the Class by its misconduct; and whether prospective injunctive relief is appropriate . . . . Moreover, these common issues will be decided using common evidence. Plaintiffs and the Class performed virtually identical pre- and post-shift activities across different Department of Corrections facilities over the time period of the class, and their employment by [DOC] is governed by the same Labor Agreement and Procedures Manual.

First, DOC argues the variation in activities, time spent thereon, length of employment, and differing facility requirements and practices all preclude a finding of predominance. None of these individual variations negate the circuit court's conclusions as to predominance excerpted above and supported by the record. Furthermore, none of these variations are relevant in the context of this case, where it was properly concluded as a matter of law that, pursuant to the contract, the officers' workday began when they began pre-shift activity and ended when they completed post-shift activity. DOC also argues that it was prevented from offsetting damages via individualized evidence of time worked being rounded to the nearest fifteen-minute interval. While this evidentiary topic may have been an important aspect of DOC's evidence and argument regarding damages at trial, it is not sufficient to preclude the circuit court from finding predominance in the exercise of its discretion considering a motion to decertify. *Smith*, 289 S.W.3d at 688 (noting that predominance only requires "one single common issue that is the

overriding issue in the litigation."); *State ex rel. McKeage*, 357 S.W.3d at 600 ("[P]redominance is not precluded when there needs to be an inquiry as to individual damages."). Finally, DOC's predominance arguments regarding the *de minimis* doctrine and FLSA requirements as individualized defenses are without merit for the reasons discussed in our analysis of DOC's Points I and II above.

*Superiority*

The circuit court must find that a class action is superior to other methods for adjudication of the case in deciding not to decertify a class. Rule 52.08(b)(3). This court explained this requirement in *Elsea v. U.S. Engineering Co.*:

> The superiority requirement requires the trial court to balance, in terms of fairness and efficiency, the merits of a class action in resolving the controversy against those of alternative available methods of adjudication. The balancing must be in keeping with judicial integrity, convenience, and economy. Class actions which aggregate small claims that could not otherwise be brought are exactly the type of claims that satisfy the superiority requirement. In balancing the relative merits of class action versus alternative methods of adjudicating the controversy, courts should consider the inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually.

463 S.W.3d 409, 423 (Mo. App. W.D. 2015) (citations omitted) (internal quotation marks omitted).

Here, the circuit court expressly concluded that the superiority requirement was satisfied: "Decertifying the Class would create a need for thousands of mini-trials deciding identical issues. Including [MCOA] does not change this analysis, as numerous class members are not members of [MCOA]. Moreover, decertifying the Class after over three years would substantially prejudice its members['] rights to due process." DOC simply points to the same reasoning that it urged precluded a predominance finding, and argues the same also precluded the court's conclusion that a class action was superior. We find that the circuit court was well

14

within its discretion based on the record and its articulated reasoning in refusing to decertify the class based on DOC's arguments that the requirement of superiority was not met.

DOC fails to show the circuit court abused its discretion in denying DOC's motion for class decertification. Point V is denied.

In its sixth and final point, DOC argues that the circuit court erred in entering declaratory judgment in favor of class plaintiffs on their Count VII because (1) DOC "has no duty to track non-compensable time; (2) the declaratory judgment duplicates the breach of contract award; (3) ordering a new timekeeping system and prospective payment for pre- and post-shift activities went beyond the contract and the relief requested in the complaint; (4) electronic timekeeping systems are "unachievable"; and (5) the judgment's order that DOC pay overtime prospectively for the officers' pre- and post-shift work is "unlawful" because the legislature has not appropriated funds to pay the officers for their work and because the commissioner of administration has not certified the expenditure.

As discussed in our above analysis of Points I, II, and III, the time DOC asserts is non-compensable and therefore not within its duty to track is, indeed, compensable. As such, we will not address this subpoint further.

The DOC contends that the declaratory judgment was duplicative of the breach of contract award. This is patently not so, given that the breach of contract judgment was for damages incurred due to DOC's breach of the contract up to the point of the judgment, whereas the declaratory judgment clarified the parties' rights under the contract and obligations moving forward under that contract following the date of the judgment. Section 527.010 gives the circuit courts "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." The circuit court may enter such a judgment construing a contract "either

15

before or after there has been a breach thereof." § 527.030. Here, the circuit court, in granting the officers' declaratory judgment count, construed the contract after there was a breach by DOC, which is fully contemplated by the express provisions of the Declaratory Judgment Act.

DOC complains the declaratory judgment's order for an adequate timekeeping system and future pay for pre- and post-shift work by the officers went beyond the substance and the expiration of the contract, as well as the relief requested in the complaint. "[A] court generally has the inherent power to make such proper orders as are necessary to effectuate its decrees." *State ex rel. Cullen v. Harrell*, 567 S.W.3d 633, 639 (Mo. banc 2019) (internal quotation marks omitted). The circuit court's judgment did nothing more than require DOC to comply with its obligations under the contract, as set forth in the declaratory judgment. The declaratory judgment clarified the parties' rights and obligations under the contract, including DOC's obligation to pay the officers for work, including pre- and post-shift activities. DOC's refusal to so pay and refusal to record time in a manner to properly calculate such pay made the declaratory judgment's order for adequate timekeeping and future obligation to pay pursuant to the contract "necessary to effectuate" the judgment.

Finally, DOC argues in conclusory fashion and without citation to legal authority nor any argument demonstrating how principles of law interact with the facts of the case, that enacting a timekeeping system within the timeline set by the circuit court's judgment was "unachievable" and that any funds ordered to be paid were not presently appropriated by the legislature. "The argument should demonstrate how principles of law and the facts of the case interact[, and a] contention that is not supported with argument beyond conclusions is considered abandoned." *Lattimer v. Clark*, 412 S.W.3d 420, 423 (Mo. App. W.D. 2013) (internal quotation marks omitted). "If a party does not support contentions with relevant authority or argument beyond

16

conclusory statements, the point is deemed abandoned." *Frazier v. City of Kansas City*, 467

S.W.3d 327, 346 (Mo. App. W.D. 2015) (internal quotation marks omitted).

Point VI is denied.

## Conclusion

The judgment is affirmed.

/s/*Mark D. Pfeiffer*

Mark D. Pfeiffer, Judge

Lisa White Hardwick, Presiding Judge, and Thomas H. Newton, Judge, concur.